UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HIGHWAY J CITIZENS GROUP, U.A.;
WAUKESHA COUNTY
ENVIRONMENTAL ACTION LEAGUE;
and JEFFREY M. GONYO,

      Plaintiffs,

Case No. 15-CV-994-pp

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION; ANTHONY FOXX,
Secretary of Transportation; FEDERAL
HIGHWAY ADMINISTRATON; GREGORY
G. NADEAU, Acting Administrator for the
Federal Highway Administration; MARK
GOTTLIEB, Secretary of the Wisconsin
Department of Transportation,

      Defendants.

## DECISION AND ORDER DENYING MOTION
## FOR PRELIMINARY INJUNCTION (DKT. NO. 6)

      The plaintiffs, Highway J Citizens Group (the "Citizens Group"), Waukesha County Environmental Action League ("WEAL"), and Jeffrey M. Gonyo filed this case against the United States Department of Transportation ("USDOT"), the Secretary of Transportation in his official capacity, the Federal Highway Administration ("FHWA"), Gregory G. Nadeau in his official capacity as the Administrator of FHWA, and Mark Gottlieb in his official capacity as Secretary of the State of Wisconsin Department of Transportation ("WisDOT"). Dkt. No. 1. The plaintiffs allege that federal approval of a road construction

1

project involving rebuilding, widening, and resurfacing a 7.5 mile segment of Wisconsin State Highway 164 (the Highway 164 Reconditioning Project, or "the Project") violates the Administrative Procedure Act ("APA"), 5 U.S.C. §500 et seq., and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §4321 et seq. Along with their complaint, the plaintiffs filed a motion for a preliminary injunction. Id. The court set a briefing scheduled, Dkt. No. 28, and the parties filed briefs. On November 12, 2015, the court heard oral arguments on the plaintiffs' motion and took the matter under advisement.

The court has considered the parties' briefs (including the defendants' surreply brief, Dkt. No. 38-1, and the plaintiffs' response to that brief, Dkt. No. 39), the parties' arguments made at the preliminary injunction hearing, the portions of the administrative record that were filed in support of and in opposition to the motion, and the relevant statutes and regulations. For the reasons explained below, the court denies the plaintiffs' motion without prejudice.

I.  **BACKGROUND**

   **A. The Highway Reconditioning 164 Project**

Two-lane rural Highway 164 (formerly known as Highway J) runs north-south between County Q and Highway 60 in the Village of Richfield and the Town of Polk, Wisconsin. Dkt. No. 8-1, at 39. It passes "through the Kettle Moraine with many hills and valleys," provides a "link between the suburban areas of Waukesha, Pewaukee, and Sussex and southern Washington County . . . and serves as the backbone for east-west highways that collect and

2

distribute traffic in southern Washington County." Id. Highway 164 is a part of the National Highway System, which includes roads that are "important to the economy, defense, and mobility." Id. Highway 164 is "functionally classified as a principal arterial" highway, which are "intended to serve moderate length through trips, higher density traffic, movements between regional economic centers, and to provide access to adjacent development while maintaining a high level of through traffic mobility." Id.

The highway was constructed in the 1960s "with 5 to 6.5 inches of asphalt over 9 inches of aggregate base course." Id. In 2000, the roadway was "overlaid with 2.5 to 3.5 inches of asphalt." Id. at 43. The "initial service life of an asphalt pavement is approximately 22 years and the service life of an asphalt overlay is approximately 12 years." Id. The pavement now is "in fair condition with transverse and longitudinal cracking along the project length," which is deteriorating and expected to continue to deteriorate at a higher rate" in the future. Id.

In addition to the deteriorating physical condition of the roadway itself, Highway 164 does not meet current construction design standards. It has insufficient sight distances at hills and intersections, steep shoulder slopes, and steep grades. Id. at 32. "Most of the intersections in the project corridor are substandard because they do not have turn lanes or bypass lanes, and these deficiencies contribute to the reduced traffic flow along" Highway 164." Id. at 43. Highway 164 also has elevated crash and injury rates compared to similar highways—between 2008 and 2012, its "overall crash rate is 63%

3

higher than the statewide average for similar 2-lane rural highways" in that period. Id. When a crash occurred on Highway 164 during 2008 and 2012, "[a]n injury resulted 35% of the time . . . which is 45% higher than the statewide average for 2-lane rural highways.", and crashes resulted in 45 percent more injuries than on similar highways. Id.

In December 2013, after WisDOT abandoned its pursuit of a more extensive reconstruction project involving a larger portion of Highway 164 (which would have included the area affected by the Project within it), WisDOT published a draft Environmental Report ("Draft ER") describing the current Project. Dkt. 30, ¶4-6; Dkt. 9-1 at 3-5. The Draft ER states that the Project is designed to improve safety and to remedy poor pavement conditions, insufficient sight distances, lack of turn lanes, long waits and delays, steep slopes and grades, and to provide adequate bicycle facilities. Dkt. No. 9-1 at 2-9. The Draft ER concluded that the Project would have no impact on economic development in the area, would not cause indirect or cumulative environmental effects, and does not involve a high degree of controversy. Id. at 26, 28, 31. Before WisDOT issued the Draft ER, public involvement meetings were held in 2011, 2012, and 2013. Id. at 19. A public hearing was held on the Project on January 23, 2014. Dkt. No. 30, ¶6. At the request of the Citizens Group, the end-date of the public comment period was extended from February 6, 2014 to February 28, 2014. Dkt. No. 8-1 at 3.

In April 2015, following the public notice and comment period, WisDOT issued its Final Environmental Report ("Final ER"). According to the Final ER,

4

the primary focus of [the Project] is to address the poor pavement condition and safety in the corridor. Improving traffic flow is also an important consideration; especially at locations where traffic congestion and poor traffic operations have contributed to a crash history." Id. In the Final ER, WisDOT recommended proceeding with construction on Project as the preferred alternative. WisDOT considered several alternatives to the Project, including no-build, speed limit reduction, maintenance overlay only alternatives. Dkt. No. 8-1, at 45-46. WisDOT rejected each alternative, other than the preferred alternative (the Project), because no alternative would meet all of the stated purposes and goals for the Project. Id.

**B. The NEPA Review Process**

NEPA has been described as a procedural "action forcing" statute, because it requires an agency to take steps to ensure informed public decision making, but it does not direct the agency to select any certain outcome. Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, 435 U.S. 519, 558, 98 S. Ct. 1197 (1978). Federal agencies must follow NEPA regulations promulgated by the Council on Environmental Quality ("CEQ"). 40 C.F.R. §1500.3. Under NEPA, when a federal agency proposes a "major federal action [] significantly affecting the quality of the human environment, the agency must prepare an Environmental Impact Statement ("EIS") analyzing the potential environmental effects of the proposed action and evaluating possible alternatives. 42 U.S.C. §4332(2)(C). An EIS sets forth the "environmental impact of the proposed action," the unavoidable "adverse environmental

5

effects," and the alternatives to the proposed action" that could accomplish the agency's objective with less environmental impact.

The plaintiffs allege that the defendants violated NEPA by deciding to proceed with the Project without preparing an EIS. According to the plaintiffs, the Project is a major federal action and its anticipated environmental effects require the FHWA to prepare an EIS and accompanying Record of Decision (ROD). Dkt. No. 6 at 22. The plaintiffs contend that, if the FHWA was uncertain whether an EIS is necessary, it should have prepared an "Environmental Assessment" (EA), which addresses whether any "significance" criteria are triggered— including whether the project is controversial, whether it will impact public safety or unique natural characteristics of the area, or is connected to other actions with collectively significant impacts. Id. at 22-23. An EA evaluates the potential environmental impacts of the Project and, if the significance criteria are met, then the FHWA would have been required to prepare an EIS. 40 C.F.R. §§1501.3(b), 1508.9. If the EA had concluded that an EIS is not necessary, the FHWA would have been required to issue a "Finding of No Significant Impact" (FONSI). 40 C.F.R. §1501.4(e).

For certain projects, neither an EIS nor an EA is necessary: those that "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of" the governing regulations (40 CFR §1500.1 et seq.). Such projects may proceed without an EIS or an EA under the "categorical exclusions" ("CE") promulgated by the FHWA. A

6

categorical exclusion is available for an action which satisfies the criteria set forth in in 40 C.F.R. §1508.4, and, based on an agency's past experience with similar actions, does not involve significant environmental impacts.

WisDOT determined (and FHWA agreed) that the Project meets the categorical exclusion criteria contained in 23 C.F.R. §771.117(d). Dkt. No. 8-1 at 29-30, 75. Section 771.117(c)(26) excludes the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e) of this section." Section 771.117(d)(13) creates an express exception for "Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that *do not meet the constraints in paragraph (e)* of this section." (emphasis added).

WisDOT determined that the Project could proceed under a categorical exclusion because it "

> does not induce significant impacts to planned growth or land use for the area; does not require the relocation of significant numbers of people; does not have a significant impact on any natural, cultural, recreational, historic or other resource; does not involve significant air, noise, or water quality impacts; does not have significant impacts on travel patterns; and does not otherwise, either individually or cumulatively, have significant environmental impacts.

Dkt. No. 8-1 at 29. Consequently, WisDOT concluded that "a higher level environmental document is not required" because "[n]o significant environmental impacts have been identified through the project development process, or in coordination with the resource agencies[.]" Id.

7

The plaintiffs argue that the Project does not qualify for a categorical exemption, both because of its significant scope and because the FHWA's regulations do not list road improvements or lane widening as a specific action that is excluded from the EIS or EA requirements. The plaintiffs further argue that the Project cannot proceed under a categorical exclusion because "substantial controversy" surrounds the Project.

## II.   DISCUSSION

### A. Preliminary Injunction Standards

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." Turnell v. CentiMark Corp., 796 F.3d 656, 661 (7th Cir. 2015) (citing Goodman v. Ill. Dep't of Fin. and Prof'l Regulation, 430 F.3d 432, 437 (7th Cir. 2005)). "[A] district court engages in a two-step analysis to decide whether such relief is warranted." Id. (citing Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc., 549 F.3d 1079, 1085–86 (7th Cir.2008)). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." Id. at 661-62.

If the movant satisfies the first three criteria, "then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the

effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest'). Id. at 662. "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." Id.

### B. The Plaintiffs Have Not Shown That They Will Suffer Irreparable Injury If The Court Does Not Enjoin Progress On The Project.

The plaintiffs claim that they already have suffered and will continue to suffer irreversible harm because: (1) they have received notices that they must allow appraisal inspections of their property, (2) several of them have had surveying stakes have been placed on their property without permission, (3) construction of the Project will entail a taking of some individual plaintiffs' property, (4) some plaintiffs' means of ingress and egress at their property will change, (5) the Project will destroy landscaping and trees, (6) the Project will impair wetland areas and adversely affect the environment, (7) the Project will promote "rampant commercial, industrial, and residential development where Plaintiffs' members enjoy the tranquil rural character of the area," (8) the plaintiffs have suffered severe stress and anxiety resulting from past work on the Project, and (9) the Project will impair their possession, use, and enjoyment of their property in the future. Dkt. No. 6 at 29-33. The court finds that the plaintiffs are not likely to suffer irreparable harm if a preliminary injunction is not entered.

First, economic losses ordinarily do not constitute irreparable harm that would be sufficient to enjoin the defendants' work on the Project. See Roland

9

Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984). Harm is not considered irreparable if it can be effectively and adequately compensated by money damages at the end of trial. See id.

In Roland Machinery, the Seventh Circuit identified four general circumstances where "an award of money damages at the end of trial will be inadequate . . . ." First, the "damage award may come too late to save the plaintiff's business." Id. Here, certain plaintiffs have alleged that the Project will diminish their farms' economic production, but none have demonstrated that the Project will end the financial viability of their farm operations. Second, monetary damages are inadequate relief if the plaintiff cannot finance his lawsuit "without the revenues from his business that the defendant is threatening to destroy." Id. The plaintiffs have not argued they cannot finance this case if the Project proceeds. Third, damages "may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." Id. This factor is not relevant here. Fourth, legal remedies are inadequate if the "nature of the plaintiff's loss" makes damages "very difficult to calculate." Id. The plaintiffs' potential economic losses from the impact of the Project on their farm operations can be calculated in terms of lost profits. Even in the context of eminent domain, a Wisconsin federal court has held that monetary compensation is sufficient, based on the value of the taken property as determined in the state eminent domain proceedings. Sierra Club v. Resor, 329 F. Supp. 890 (W.D. Wis. 1971) ("I agree that if the project is shown to be unlawful, as plaintiffs contend it to be, certain landowners,

10

perhaps including one or more of the plaintiffs, may involuntarily exchange for cash parcels of land which they may prefer to keep. However, I cannot agree that an injury of this kind has been considered irreparable in the law."). The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." Shaffer v. Globe Prot., Inc., 721 F.2d 1121, 1124-25 (7th Cir. 1983) (quoting Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937 (1974)). Accordingly, the court finds that the plaintiffs have not shown that their potential economic injuries are irreparable and warrant injunctive relief.

Moreover, NEPA is not intended to protect against economic losses. NEPA's purpose "is to protect the environment, not the economic interests of those adversely affected by agency decisions." Nevada Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993) (citation omitted). "To establish an injury-in-fact from failure to perform a NEPA analysis, a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent *environmental* harm; and 2) that this increased risk of *environmental* harm injures its concrete interest." Maiden Creek Assocs., L.P v. United States Dep't of Transp., No. 15-242 2015 WL 4977016 (E.D. Pa. Aug. 20, 2015) (quoting Comm. to Save Rio Hondo v. Lucero, 102 F.3d 445, 449 (10th Cir. 1996) (emphasis added).

Certain of the plaintiffs' alleged injuries absent injunctive relief would constitute environmental harm. The plaintiffs maintain that Project will

11

diminish the aesthetic beauty of the Kettle Moraine, damage the natural environment of the area (including wetlands vital to the habitat of plant and animal species), reduce air quality, and impinge on the plaintiffs' recreational enjoyment of the area. Dkt. No. 6 at 33. They claim that these effects have been inadequately studied, because the defendants have not completed an EIS or EA. It is well settled that this kind of environmental injury constitutes irreparable harm. Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable.").

To support entry of a preliminary injunction, however, the alleged irreparable harm must threaten to occur before a final decision on the merits. Construction on the Project is not set to begin until April 2018, and summary judgment briefing concluded as of June 2016; the parties have requested oral argument (Dkt. No. 63). Both factors militate against entry of a preliminary injunction, and the court finds that the plaintiffs' have not persuasively argued that they will suffer irreparable harm before the court issues a decision on summary judgment.

To counter the apparent lack of urgency to enjoin work the Project, the Plaintiffs invoke the concept of a "bureaucratic steam roller" that must be stopped before it can start (or generate any more momentum) in order to avert future harm. Dkt. No. 36 at 18. See Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989) ("The difficulty of stopping a bureaucratic steam roller, once

12

Case 2:15-cv-00994-PP    Filed 09/27/16    Page 12 of 15    Document 64

started, still seems to us . . . a perfectly proper factor for a district court to take into account in assessing" the risk "that real environmental harm will occur through inadequate foresight and deliberation."). The Plaintiffs contend that, if the Project is not halted now, the Defendants will enter into contractual and other legal commitments that cannot (or practically cannot) be broken, rendering Project and its environmental impacts inevitable and negating the benefit of any relief the court ultimately may award. Dkt. No. 36 at 17-19.

In support of their argument, the Plaintiffs rely heavily on a decision by another court in this district, which granted a preliminary injunction to halt a construction project out of concern that the government could become wedded to an allegedly ill-considered construction project. That court explained:

> it appears that the plaintiffs will suffer a form of irreparable harm in the absence of a preliminary injunction. WisDOT has made plans to implement the project and is in the process of awarding contracts to bidders and making other commitments that would be difficult to break. This means that the longer it takes to reach a decision on the merits of this case, the more committed WisDOT and the FHWA will be to this particular version of the project. If the plaintiffs win this case, the remedy will involve vacating the agencies' decision to implement the project and requiring them to make a fresh decision after correcting the deficiencies in the EIS. However, in the absence of an injunction, by the time the agencies revise the EIS and make a new decision, they may have made so many commitments to the preset version of the project that they will have no choice but to select that version once again, even if the corrected EIS reveals that a different version of the project would be preferable. If that happens, NEPA's action-forcing purpose will have been defeated. The agency will have made up its mind based on deficient environmental information, and when the agency corrects the deficiency and assembles an accurate EIS, the agency

13

> will feel compelled to ignore the accurate information and simply choose the project to which it had already committed itself. For this reason, courts have recognized that NEPA plaintiffs are likely to suffer irreparable harm when an agency is allowed to commit itself to a project before it has fully complied with NEPA.

Milwaukee Inner-City Congregations Allied for Hope v. Gottlieb, 944 F. Supp. 2d 656, 663-64 (E.D. Wis. 2013) (citations omitted).

The court finds there is no similar risk of irreparable injury if the Project is not enjoined, at least now. While preliminary work, including surveying, and appraisal staking, has occurred on certain properties, the Project's final design is not scheduled to be complete until February 2017. Dkt. No. 31, ¶¶8, 15. Contract bidding is scheduled to open on September 11, 2018. Id., ¶16. Construction on the Project "is currently scheduled for April through December of 2019." Id., ¶17. Further, the defendants indicated at the November 12, 2015 oral argument that they would compile the administrative record as quickly as feasible. Dkt. No. 41 at 3. They did so; they lodged the record on March 1, 2016. Dkt. No. 46. In light of the length of time until the Project's design will be final (let alone the start of construction), and the fact that summary judgment briefing has been concluded, the court expects that a decision on the merits can be reached before the defendants commit irrevocably to the Project.[1]

---

[1] It appears that, in the event advanced funds become available for the Project, final project design, bidding, and construction could occur sooner than currently anticipated. Dkt. No. 31, ¶¶14-16. It is not clear how likely that is to occur, but the court will consider the impact (if any) that advanced funds might have on these issues if such funds will become available while the case is pending in this court.

### C. The Court Need Not Reach, in This Order, the Question of Whether the Plaintiffs' Claims Have a Reasonable Likelihood of Success On The Merits.

Because the plaintiffs have not satisfied the irreparable harm factor of the injunctive relief test, the court need not, in this order, move on to determine whether the plaintiffs' claims have a reasonable likelihood of success on the merits. The court notes that it will reach the merits, in any event; as discussed above, the parties have concluded summary judgment briefing, and the court will shortly notice a hearing date for oral argument on the summary judgment motions.

### III. CONCLUSION

For the reasons explained above, the court **DENIES WITHOUT PREJUDICE** the plaintiffs' motion for preliminary injunction. Dkt. No. 6. If events occur that give the plaintiffs reasonable cause to believe that they will suffer irreparable injury imminently without an injunction preventing further advancement of the Project, the plaintiffs may renew their motion at such time.

Dated in Milwaukee, Wisconsin this 27th day of September, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge